UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                      CASE NO:  3:20-cv-1119-J-32JBT

REAL PROPERTY, INCLUDING ALL
IMPROVEMENTS THEREON AND
APPURTENANCES THERETO,
LOCATED AT 2637 145th ROAD, LIVE
OAK, SUWANNEE COUNTY, FL 32060

    Defendant.

## AMENDED[1] VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

In accordance with Rule G(2) of the Supplemental Rules for Admiralty or

Maritime Claims and Asset Forfeiture Actions, Plaintiff United States of America

brings this amended complaint and alleges upon information and belief as follows:

## NATURE OF THE ACTION

1.    This is a civil action in rem to forfeit to the United States a piece of real

property (Defendant Property). This action is brought pursuant to 18 U.S.C. §

981(a)(1)(C) because the Defendant Property was purchased with proceeds of wire

fraud and is derived from proceeds traceable to wire fraud in violation of 18 U.S.C. §

1343.  In addition, this action is brought pursuant to 18 U.S.C. § 981 (a)(1)(A)

---

[1] The Verified Complaint for Forfeiture *in Rem*, Doc. 1, is being amended only to correct the case caption.

because the Defendant Property was involved in, and is traceable to, monetary transactions in violation of 18 U.S.C. § 1957, consisting of wire fraud proceeds or property traceable to such proceeds, and was involved in monetary transactions of a value greater than $10,000.

## JURISDICTION AND VENUE

2.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345, which provides the Court with jurisdiction over all civil actions commenced by the United States, and pursuant to 28 U.S.C. § 1355, which provides the Court with jurisdiction over actions to recover or enforce forfeitures.

3.      This Court has in rem jurisdiction over the Defendant Property because pertinent acts giving rise to the forfeiture occurred in the Middle District of Florida, 28 U.S.C. § 1355(b)(1)(A).

4.      Pursuant to Rule G(3)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and 18 U.S.C. § 985(c)(2), a notice of this forfeiture, as well as a copy of the original complaint, was posted on the Defendant Property and the United States will serve a copy of the Amended Complaint on its owners.  Thereafter, neither the issuance of a warrant in rem nor any other action will be necessary for the Court to establish in rem jurisdiction over the Defendant Property.

5.      Venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395(b) because the Defendant Property lies within the district.

6.     Venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395(a) because acts in furtherance of the scheme were made in Live Oak, Florida and Lake City, Florida.  Both are located within the Middle District of Florida.

7.     The Defendant Property is located in Suwannee County, Florida, in the Middle District of Florida, as described as:

a)     The N½ of NE¼ of SE¼ of Section 18, Township 1 South, Range 13 East, Suwannee County, Florida;

AND

b)     The SW¼ of NE¼ and the North 330 feet of the NW¼ of SE¼ of Section 18, Township 1 South, Range 13 East, Suwannee County, Florida.

Parcel Identification Number: 0467500-3000.

## FORFEITURE AUTHORITY

8.     Because the Defendant Property was purchased with proceeds of wire fraud or was derived from proceeds traceable to wire fraud, it is subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), which states the United States may civilly forfeit property, real or personal, which constitutes, or is derived from proceeds of "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7).  Section 1956(c)(7) defines "specified unlawful activity" to include activities described in Section 1961(1), such as violations of 18 U.S.C. 1343 (wire fraud).

9.      Because the Defendant Property was involved in money laundering, it is subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), which states the United States may civilly forfeit any property, real or personal, involved in a transaction in violation of 18 U.S.C. § 1957, or any property traceable to such transaction.

10.     Specific details of the facts supporting the forfeiture of the Defendant Property have been provided by Federal Bureau of Investigation (FBI) Special Agent Robert W. Blythe (SA Blythe), who obtained the information through investigation, reviewing documents, and communicating with witnesses and other law enforcement officers.

11.     The facts set forth below are not all of the facts gathered by law enforcement during the investigation.  Rather, as required by Rule G(2)(f), the facts set forth herein support a reasonable belief that the government will be able to meet its burden of proof at trial.  Specifically, that the government will be able to show by a preponderance of the evidence that the Defendant Property is subject to forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 981(a)(1)(A).

A.      **Introduction**

12.     SA Blythe has been employed by the FBI for over twelve years.  He is currently assigned to the Jacksonville Division, having previously been assigned to the New Orleans Division. SA Blythe has led, conducted and participated in numerous investigations pertaining to violations of federal law involving civil rights, bribery extortion, wire fraud, and mail fraud.  SA Blythe has worked on numerous

white collar and public corruption investigations, which have resulted in the indictment and conviction of numerous defendants.

13.     SA Blythe is the case agent for a public corruption investigation initiated by the FBI in the summer of 2018.  The investigation arose from allegations that the elected State Attorney for the Third Judicial Circuit of Florida, Jeffrey Siegmeister, was engaged in a bribery scheme whereby he solicited money or things of value from defendants and their attorneys in exchange for favorable prosecution treatment of defendants prosecuted by his office.  The investigation revealed that Siegmeister was also involved in a scheme to defraud an individual, Leonard Whitman Thomas, and his Estate, of a significant amount of money.  This scheme began prior to Siegmeister's election as State Attorney but continued during the time he held that office.  Siegmeister had been appointed Thomas' Voluntary Guardian by the Columbia County Probate Court for the Third Judicial Circuit of Florida (the Probate Court).  To facilitate the scheme, Siegmeister made material misrepresentations to the Probate Court and transferred hundreds of thousands of dollars from Thomas and his Estate to himself and his mother, Nancy A. Bowen.

### B.     Voluntary Guardianship

14.     According to the State of Florida Courts, a guardian is a "surrogate decision-maker appointed by the court to make either personal and/or financial decisions for a minor or for an adult with mental or physical disabilities."[2]  "Florida

---

[2] https://www.flcourts.org/Resources-Services/Court-Improvement/Family-Courts/Guardianship

law allows both voluntary and involuntary guardianships. A voluntary guardianship may be established for an adult who, though mentally competent, is incapable of managing his or her own estate and who voluntarily petitions for appointment." *Id.* The legal authority for Guardianship is found in Chapter 744, Florida Statutes.

15.    Florida Probate Rules Part III Rule 5.600 requires every guardian to take an oath to perform faithfully the duties of the guardian before exercising such authority.

16.    Florida law provides that Guardians owe a fiduciary duty to their Wards and must avoid any conflict of interest. A guardian cannot profit from his or her relationship with a Ward, except for the payment of reasonable fees and expenses. Florida Statute § 744.446 prohibits conflicts of interest for guardians. Florida Statute § 744.446(2) states,

> Unless prior approval is obtained by court order, or unless such relationship existed prior to appointment of the guardian and is disclosed to the court in the petition for appointment of guardian, a guardian may not:
>
> > a)  Have any interest, financial or otherwise, direct or indirect, in any business transaction or activity with the guardianship;
> >
> > b)  Acquire an ownership, possessory, security, or other pecuniary interest adverse to the Ward;
> >
> > c)  Be designated as a beneficiary on any life insurance policy, pension, or benefit plan of the Ward unless such designation was validly made by the Ward prior to adjudication of incapacity of the Ward; and
> >
> > d)  Directly or indirectly purchase, rent, lease, or sell any property or services from or to any business entity of which the guardian or the guardian's spouse or any of the guardian's lineal descendants, or collateral kindred, is an officer, partner, director, shareholder, or proprietor or has any financial interest.

### C.    Case Background

17.    SA Blythe reviewed records from the court file: In re: Guardianship of Leonard W. Thomas, File Number 2010-65-GR, filed in the Probate Court.  SA Blythe learned from his review of the Petition for Voluntary Guardianship (the Guardianship Petition) and Petition for Expenditure of Funds filed with the Probate Court by Siegmeister on March 26, 2010, that in early 2010, Leonard Whitman Thomas, then 80 years old, was hospitalized with an injury.  At the time of his injury, Thomas was transient and had been living at a Motel 6 in Lake City, Florida, for approximately six months to a year.  Following his release from the hospital, Thomas was transferred to Suwannee Home Health and Rehab Center in Live Oak, Florida.

18.    On March 26, 2010, Siegmeister, an attorney operating The Siegmeister Law Firm, P.C., Lake City, Florida, filed a Guardianship Petition with the Probate Court.  On December 5, 2019, SA Blythe interviewed Nancy A. Bowen, Siegmeister's mother, who told him that Siegmeister was referred to Thomas by Adult Protective Services.

19.    According to his Application for Appointment of Guardian for Thomas, Siegmeister had experience serving as a Voluntary Guardian for military veterans when he was appointed Voluntary Guardian for Thomas.  He had previously been approved as a Guardian for 15 individuals.  The application also

reflects that his last Guardian appointment was January 24, 2007, more than three years prior to being appointed the Voluntary Guardian for Thomas.

20.    On August 20, 2020, FBI SA Hill and IRS-CI SA Craig Castiglia conducted a follow-up recorded interview of Bowen.  Bowen told the agents that Siegmeister was not related to Thomas and had not met him prior to undertaking the process of becoming his Guardian. In the Guardianship Petition, Siegmeister alleged that Thomas, "although mentally competent, is incapable of the care, custody and management of his estate by reason of age or physical infirmity." The filing was accompanied by two certificates from licensed physicians, who determined Thomas to be competent to understand the nature of the Guardianship and his delegation of authority to Siegmeister.

21.    In the Guardianship Petition, Siegmeister disclosed to the Probate Court that the approximate value of Thomas' property at that time was $664,751.93 in Coca-Cola stock and $36,992.58 in funds held at First Federal Bank and Fifth Third Bank.

22.    On March 26, 2010, the Probate Court Judge issued an Order Appointing Siegmeister as the Voluntary Guardian for Leonard Thomas. (Guardianship Order).

23.    The same day, Siegmeister also filed a Petition for Expenditure for Funds.  In the filing, Siegmeister notified the Probate Court that Thomas desired to have a last will and testament prepared and that Thomas had "Heirs that he would like to include in his estate." Siegmeister requested the court authorize $1,000, plus

8

costs, to cover the preparation of the Last Will and Testament (Will). The Probate Court authorized the expenditure the same day.

24.     On May 5, 2010, approximately five weeks later, Thomas signed his Will while he was residing at Still Waters Assisted Living Facility in Lake City, Florida. Bowen, Siegmeister's mother, and S.N. signed as witnesses, with K.B as the notary. K.B. was employed with The Siegmeister Law Firm, P.C. and S.N. was employed at Still Waters Assisted Living Facility. In the Will, Thomas' entire estate was bequeathed to Bowen, his Guardian's mother.[3] If Thomas were to survive Bowen, the Will required Thomas' entire estate be bequeathed to St. Jude's Children's Hospital. The Will also appointed Jeffrey Siegmeister as the Personal Representative, to handle the matters of Thomas' Estate upon death. If Siegmeister was unable to serve as the Personal Representative, Bowen was to be appointed as the Personal Representative. When she was interviewed, Bowen stated that Siegmeister requested she offer assistance to Thomas. Bowen also said that Siegmeister had enlisted her to assist with some of Thomas' needs. She visited him about once a week at the assisted living facility and purchased items for him when the assisted living facility told her Thomas needed something; she would occasionally take Thomas to appointments, although the assisted living facility also provided transportation for him.

---

[3] Bowen initially stated during her interview in August 2020 that she did not know about Thomas' Will. When agents pointed out that she had signed the Will as a witness, she responded that she had not known what she was signing.

25.     As the Voluntary Guardian, Siegmeister was directed by the Probate Court to take possession of Thomas' property and attend to Thomas' financial matters. Included in this responsibility was the duty to dispose of Thomas' assets to pay Thomas' expenses. Siegmeister primarily utilized First Federal Bank account XXXXX2860, held in Thomas' name with Siegmeister as Guardian (the Guardianship Account-2860), to conduct Thomas' financial transactions until shortly after Thomas' death in early 2015. Siegmeister opened the account on April 13, 2010 and had signature authority. When needed, Siegmeister would sell Thomas' Coca-Cola stock holdings and use the proceeds to pay Thomas' expenses via checks and other debits from the Guardianship Account-2860, where the liquidated stock proceeds and dividends were deposited.

26.     As Voluntary Guardian, Siegmeister was also responsible for filing Annual Accountings with the Probate Court disclosing itemized expenditures and the current asset inventory for Thomas.

27.     On September 11, 2013, after the Issuance of an Order to Produce or Show Cause, Siegmeister withdrew as counsel of record and attorney R.D. was substituted as the attorney of record for Thomas' Voluntary Guardianship. Siegmeister remained as the Guardian. Through R.D., on or about November 27, 2013, Siegmeister filed, under penalty of perjury, two Annual Reports of Guardian Property Annual Accounting for the Thomas Guardianship for the period April 2010 through April 2011 and April 2011 through April 2012.

10

28.     On November 7, 2014, R.D. submitted a Petition to Sell Property of the Ward.  The petition requested that the Probate Court authorize Siegmeister to sell some of Thomas' Coca-Cola stock to pay Thomas' expenses.  The petition alleged, "Ward has incurred severe medical expenses over the past year and at present there are not enough funds in the Ward's estate to cover living expenses for the coming year."  Siegmeister signed the Petition as Guardian.  On January 10, 2015, a Probate Court Judge authorized the liquidation of Thomas' stock holdings as the "Ward has been determined to be incapacitated."  The Probate Court granted Siegmeister, as Voluntary Guardian, "leave to execute such documents, or take any other action necessary pursuant to the laws of the State of Florida, as may be necessary and appropriate to sell the property for the benefit of the Ward."

29.     On January 14, 2015, at the age of 85, Leonard Thomas died at Lake City Medical Center in Lake City, Florida.

**D.     Diversion of Thomas' Assets to Benefit His Guardian**

30.     On January 14, 2015, the day of Thomas' death and two days after the Probate Court's authorization to sell property to cover Thomas' expenses, Siegmeister deposited Computershare, Inc. check # 106346 in the amount of $40,458.20, from the liquidation of Thomas' Coca-Cola stock, into the Guardianship Account-2860.  At the time of the deposit, Siegmeister withdrew $2,000 in cash, which resulted in a net deposit of $38,458.20.

31.     On January 15, 2015, Siegmeister wrote a check from the Guardianship Account-2860 payable to himself for $18,428.20.  The memo section of the check

read "Medical reimbursement."  Siegmeister deposited the check into Columbia
Bank account # XXXX8160 held in the name of Jeffrey A. Siegmeister and Jamie L.
Siegmeister (Siegmeister Personal Account-8160).  Siegmeister opened the account
on June 29, 2006 and had signature authority.  The balance in the Siegmeister
Personal Account prior to the $18,428 deposit was $879.39.

32.    On January 21, 2015, Siegmeister wrote a check from the Guardianship
Account-2860 payable to himself for $20,000.  The memo section of the check read
"hospital/medical settlement."  Siegmeister deposited the check into the Siegmeister
Personal Account-8160, which, prior to the deposit of this check, had a balance of
$7,985.52, representing the remainder of the previous $18,428 deposit discussed in
paragraph 31 above.

33.    The $38,428 in funds Siegmeister transferred to his personal account
were used on various personal expenses, including large payments to his personal
Chase and American Express credit cards.

34.    There are no records documenting any expenses for Thomas, which
Siegmeister paid for with his own funds.  Moreover, Thomas had sufficient funds in
the Coca-Cola stock to cover his expenses.

35.    On February 2, 2015, Siegmeister deposited a Computershare check in
the amount of $190,460 into the Guardianship Account-2860.  The check was the
proceeds of some of the Coca-Cola stock that Siegmeister had liquidated. Prior to
this deposit, the Guardianship Account-2860 had a balance of $22,505.90, which
represented the remainder of the $38,458.20 deposit on January 14, 2015.  See ¶ 30

12

above. The only subsequent credits into this account were a few *de minimis* interest payments and a $3,381.84 stock dividend check.

36.    On April 15, 2015, Siegmeister closed out the Guardianship Account-2860, withdrawing the remaining balance of $200,833.94 and depositing it in First Federal Bank account XXXXX4706 held in the name of The Siegmeister Law Firm, P.A. Trust Account (IOTA) (the Siegmeister Law Firm Trust Account-4706). Siegmeister opened the account on October 4, 2011 and had signature authority. At the time of the transfer, this law firm account had a balance of $10,957.42. During SA Blythe's investigation, he did not uncover any reason for Siegmeister to have closed the Guardianship Account -2680 in April 2015 and to have deposited the remaining amounts into the Siegmeister Law Firm Trust Account -4706. During this period, Siegmeister had not been discharged as Thomas' Voluntary Guardian by the Probate Court, and the final reports and documents in the Estate were not filed until September and October 2015. See ¶¶ 48-56 below.

37.    Siegmeister wrote a $20,000 check to himself from the Siegmeister Law Firm Trust Account-4706. Siegmeister deposited the check into First Federal Bank account XXXXX3579 held in the names of Jeffrey A. Siegmeister and Jamie L. Siegmeister Rental Account (Siegmeister Rental Account) on April 17, 2015. Siegmeister had opened the account on April 1, 2010 and had signature authority. Siegmeister withdrew $2,000 in cash, resulting in a net deposit of $18,000. At the time of the deposit, the Siegmeister Rental Account had a balance of $192.30 and no other deposits were made into the account during the month of April 2015.

38.     Siegmeister paid numerous personal expenses from the Siegmeister
Rental Account, none of which were to the benefit of Leonard Thomas.  For
instance, on April 20, 2015, a check for $2,000, payable to Poole Realty, cleared
from the Siegmeister Rental Account.  On May 5, 2015, another check payable to
Poole Realty (this one for $3,000), cleared from the account.  The memo section of
the $3,000 check showed "addtl deposit 70 acres."  The $18,000 net deposit
Siegmeister made into the Siegmeister Rental Account on April 17, 2015 directly
funded the checks totaling $5,000.

39.     On May 28, 2015, Siegmeister wrote a $45,000 check to Poole Realty
from the Siegmeister Law Firm Trust Account-4706.  Thomas' liquidated Coca-Cola
stock funded the $45,000 check.

40.     Poole Realty records revealed that the three checks, totaling $50,000,
were used as a down payment for the purchase of the Defendant Real Property.  The
Defendant Real Property has been Siegmeister's primary residence since it was
purchased.  Suwannee County property records show that on June 18, 2015, a
Warranty Deed was filed with the Clerk of the Circuit Court whereby E.A and B.A.
granted Jeffrey A. Siegmeister and Jamie L. Siegmeister the property.  Suwannee
County property records also show that E.A. and B.A. are the mortgagees on a
$325,000 mortgage note on Defendant Real Property.

41.     On October 5, 2015, Siegmeister wrote check 1213 in the amount of
$3,293.46 from the Siegmeister Law Firm Trust Account -4706.  The check was
made payable to E.A. and B.A.  In the memo section of the check was written

"Payments 1&2 Oct/Nov 2015." Siegmeister purchased his residence, the Defendant Real Property, from E.A. and B.A., who are also the mortgagees on the note with Siegmeister on the Defendant Real Property. These mortgage payments were derived from the proceeds of the liquidation of Thomas' stocks and dividends paid on his stock. Specifically, on June 1, 2015, the balance in the Siegmeister Law Firm Trust Account -4706 was $47,116.36, which was primarily the proceeds of the sale of Thomas' stock. Between June 1, 2015 and October 15, 2015, the only additional deposits into the Siegmeister Law Firm Trust Account -4706 were a total of $6,763.68 in Thomas' Coca-Cola stock dividend payments.

42.    Pursuant to a marital settlement agreement filed on May 26, 2020 in the Circuit Court, Third Judicial Circuit in and for Suwannee County, Florida (Case 19-415-DR), Jamie L. Siegmeister agreed to transfer her interest in the Defendant Real Property to Jeffrey A. Siegmeister. As of September 30, 2020, however, a Quit Claim Deed had not been filed in Suwannee County Circuit Court transferring ownership to Jeffrey Siegmeister.

**Further diversions of Thomas' property**

43.    On May 8, 2015, a check for $46,000 was drawn from the Siegmeister Law Firm Trust Account-4706 to Heritage Title Service. The check, funded with Thomas' liquidated Coca-Cola stock, was signed by Siegmeister with "15-9046" written in the memo section.

44.     Records obtained from Heritage Title Services of North Florida, Inc. revealed that the $46,000 check was used as a final payment on property Siegmeister purchased for $48,500 at 444 S.E. Lakeshore Boulevard, Branford, Florida 32008 on May 20, 2015.  The file number was 15-9046, which was the same as notated in the memo section of the check.  The Lafayette County, Florida General Warranty Deed showed Siegmeister was granted the property by A.M., F.M., L.N., and A.M.

45.     Further, on May 29, 2015, Siegmeister wrote a $55,000 check to himself from the Siegmeister Law Firm Trust Account - 4706.  The memo section states "settlement fees Hudson/Thomas."  The check was deposited into the Siegmeister Personal Account -8160. Siegmeister did not use the proceeds to pay expenditures for Thomas' benefit but instead used the money to pay personal expenses.  The $55,000 check was funded with Thomas' liquidated stock.

46.     In the aggregate, Siegmeister diverted a total of at least $235,203.50 in Thomas' assets to himself from the date of Thomas' death on January 14, 2015 through October 15, 2015.  During this period, Siegmeister had not been discharged as Thomas' Voluntary Guardian by the Probate Court.

47.     During the same period, January 14, 2015 through October 15, 2015, Siegmeister wrote $15,515.54 in checks to his mother, Nancy Bowen. Many of the checks referenced "reimbursement" in the memo section.  Bowen stated in her interview in August 2020 that she did not recall receiving these checks.  Many of the checks referenced "reimbursement" in the memo section.  Bowen reported in her interview that she did not pay for Thomas' expenses, with the exception of minor

16

expenses for personal items, and perhaps an item of clothing.  Bowen reported that
Thomas had his own funds for expenses.

**Additional Diversions of Thomas' property as his Will moved to Probate and
Siegmeister was appointed Personal Representative of the Estate**

48.     On July 10, 2015, Siegmeister was ordered by the Probate Court to
produce Annual Accountings and Annual Guardianship Plans for the Thomas
Guardianship or to Show Cause.  For three years prior to the Order, Siegmeister had
failed to produce the required filings for the Probate Court for three years.

49.     On or about September 1, 2015, Siegmeister, as Guardian for Thomas,
signed, under penalty of perjury, Annual Accountings for the Guardianship for the
periods April 13, 2012 through April 12, 2013 and April 11, 2013 through April 10,
2014, which were filed by R.D., on behalf of Siegmeister.  Siegmeister also signed a
Final Accounting of Guardian Property for the Thomas Guardianship for the period
April 11, 2014, through January 31, 2015, on the same day, which was also filed by
R.D.  Siegmeister certified to the Probate Court that he had obtained a receipt or
cancelled check for all expenditures made on behalf of the Ward.  Siegmeister signed
under penalty of perjury that he "had read and examined the foregoing return and
that, to the best of my knowledge and belief, it constitutes a full and correct account
of all the Ward's property of which the Guardian has control, and is a complete
report of all cash and property transactions and of all receipts and disbursements by
me from April 11, 2014, through January31, 2015…"[sic].

50.    In addition to the Annual Accountings for the Thomas Guardianship, R.D., on behalf of Jeffrey Siegmeister, filed a Petition for Discharge of Guardian Upon the Acceptance of Final Accounting with the Probate Court, which was also signed by Siegmeister on September 14, 2015, as the Petitioner.

51.    Included in the Final Accounting of Guardian Property for the Thomas Guardianship was Section II – Expenditures.  The schedule showed the date of each expense, to whom the expense was paid, and the amount of the expenditure.  The schedule omitted the $18,428.20 and $20,000 checks Siegmeister wrote to himself from the Siegmeister Law Firm Trust Account-4706 on January 15, 2015, and January 21, 2015, respectively.  At least four items listed on Section II were fictitious and over-reported expenditures by at least $53,148.05.  The false expenditures listed on Section II were as follows:

a)    A purported $38,620 expenditure to Lake City Medical Center with a date of July 2, 2014.  Lake City Medical Center records show that this expenditure never occurred.   The Guardianship-2860 did not have a corresponding debit for $38,620.

b)    A purported $10,264.22 expenditure to Lake City Medical Center with a date of September 11, 2014.  Lake City Medical Center records show that the actual payment it received was for $264.22.  The Guardianship-2860 records corroborated Lake City Medical Center records with a $264.22 check (#2059) payable to the hospital on September 11, 2014.

c)    A purported $2,528.05 expenditure to Harper Emergency Physicians with a date of October 10, 2014.  Records of Harper Emergency Physicians show that $1,000 was received on October 14, 2014.  The Guardianship-2860 records corroborated Harper Emergency Physicians' records, with a $1,000 check (#2060) payable to Harper Emergency Physicians.

18

d) A purported $3,734 expenditure to Harpers Emergency Phys with a date of December 18, 2014. Records of Harper's Emergency Physicians show that $734 was received on December 26, 2014. First Federal Bank account XXXXX2860 records corroborated Harper's Emergency Physicians records, with a $734 check (#2071) payable to Harper's Emergency Physicians on December 18, 2014.

52. On October 23, 2015, attorney E.F., on behalf of Jeffrey Siegmeister, filed a Petition for Administration with the Probate Court. The filing included a Schedule A, which provided a summary of financial information for Thomas since his death. The Last Will and Testament for Leonard Thomas, dated May 5, 2010, also accompanied the filing. It requested that Thomas' Will be admitted to probate and that Siegmeister be appointed Personal Representative for his Estate. The filing proposed that all assets be distributed to Bowen. Siegmeister signed the Petition for Administration under penalty of perjury as the Guardian for Thomas.

53. The Schedule A to the Petition for Administration properly listed the holdings of Thomas' Coca-Cola stock on October 1, 2015 according to the Computershare records SA Blythe reviewed. There were 14,812.86 shares valued at $39.80 per share, for a total of $589,551.84.

54. The Schedule A to the Petition for Administration did not list any of the $235,203.50 in Thomas' assets that Siegmeister had diverted for his personal use from January 14, 2015 through October 15, 2015. Also excluded from the Schedule A was any reference to the $15,515.54 in payments that Siegmeister made to his mother, Bowen. To conceal the misappropriation of the Thomas' assets, Siegmeister

falsified or caused to be falsified, numerous items on the Schedule A to include the

following:

a)  Under the Section "Estate Debts – Debts paid since death (from cash on hand)" an expenditure was listed for $45,186 to Lake City Medical Center on December 26, 2014.  Lake City Medical Center records show that a payment of $86.28 was made on December 26, 2014.  The Guardianship Account-2860 showed Siegmeister wrote only one check (#2072) for $86.28 payable to Lake City Medical Center in December of 2014.

b)  Under the Section "Estate Debts – Debts paid since death (from cash on hand)" an expenditure was listed for $1,224.54 to Covenant Healthcare on January 7, 2015.  The Guardianship-2860 showed only one check (#2076) written by Siegmeister and payable to Covenant Healthcare.  Check 2076 posted on January 7, 2015 for $74.54.

c)  Under the Section "Estate Debts – Debts paid since death (from cash on hand)" an expenditure was listed for $48,428.20 to Lake City Medical Center on January 15, 2015.  Lake City Medical Center records show that only a Visa payment of $5,000 was made on January 13, 2015.  The Guardianship Account-2860 showed Siegmeister did not write any checks payable to Lake City Medical Center from January 2015 through October 2015. Siegmeister did write one check (#2083) from this account, payable to Bowen, for $5,500 on January 16, 2015.  The memo section of the check included "LCMC Hospital Payment."

d)  Under "Estate Debts - Funeral Expenses" of the Schedule A, payments of $150 and $1,895 to Crevasses Crematory were listed, with payment dates of January 15, 2015 and January 23, 2015, respectively.  Crevasses Crematory records showed that the only invoice and payment for Thomas' cremation was for $895. The Guardianship Account-2860 records corroborate Crevasses Crematory records.  The only check (#2084) written by Siegmeister to Crevasses Crematory was for $895 on January 23, 2015.

e)      Under the "Assets" Section of the Schedule A, $96,590.46 in "Cash on Hand" was reported. A review of the Siegmeister Law Firm Trust Account-4706 showed that the balance on October 15, 2015 was actually $1,654.22.[4]

55.     The Final Accounting of Guardian Property for the Thomas Guardianship and the Petition for Administration claimed that Siegmeister had made a total of $143,263.42 in payments to Lake City Medical Center on behalf of Thomas between April 2014 and October 2015. Lake City Medical Center records showed that they received a total of $19,135.82. The remaining balance was written off because Thomas had no insurance and was not eligible for Medicare or Medicaid.

56.     On February 25, 2016, Siegmeister deposited Computershare Shareholder Services check #122937 in the amount of $313,816.52 into the Siegmeister Law Firm Trust Account-4706. The check represented the proceeds of the sale of Thomas' Coca-Cola stock, which was made by Siegmeister as the Personal Representative for the Leonard Thomas Estate. Between October 15, 2015, and February 24, 2016, which essentially was the time period between the filing of Petition for Administration (to move the Will to Probate and appoint Siegmeister as personal representative) and the deposit of the $313,816.52 Computershare check, the only deposits into the Siegmeister Law Firm Trust Account-4706 were $6,507.48 in Thomas' Coca-Cola dividend checks. On March 24, 2016, Siegmeister deposited

---

[4] On April 15, 2015, the Guardianship Account-2680 was closed and the balance of $200,833.94, which would have represented "Cash on Hand" was transferred to the Siegmeister Law Firm Trust Account-4706. From that point forward, The Siegmeister Law Firm Trust Account-4706 contained all of Thomas' non-stock assets.

Computershare Shareholder Services check #6585699 in the amount of $11,634.37

into the Siegmeister Law Firm Trust Account-4706.  The check represented the

proceeds of the sale of shares of Thomas' Coca-Cola stock, which was made by

Siegmeister as the Personal Representative for the Thomas Estate.  In 2016, First

Federal Bank had a direct relationship with the Federal Reserve Bank to negotiate

deposited checks.  The Federal Reserve Bank would have received interstate

electronic wire transmissions from First Federal Bank in Florida to their processing

center in Dallas, Texas.

57.     SA Blythe reviewed a check dated March 8, 2016, check 1219, payable

to Nancy A. Bowen or Jeffrey Siegmeister, in the amount of $264,500, written from

the Siegmeister Law Firm Trust Account 4706.  The memo of the check referenced

"Estate Gift, Mr. LW Thomas."  Siegmeister deposited the check into the

Siegmeister Personal Account-8160.  The beginning balance at the time of the

deposit was $4,052.18.  Siegmeister used the proceeds to pay personal expenses,

including payments on the mortgage on Defendant Property  as follows:

  a)    Check 4703 written by Siegmeister to E.A. & B.A. in the amount
        of $1,646.73 cleared on April 15, 2016.  The memo section of the
        check referenced "April 2016."  E.A. and B.A. are the
        mortgagees on Defendant Property.

  b)    Check 4758 written by Siegmeister to E.A. & B.A. in the amount
        of $1,646.73 cleared on May 4, 2016.  The memo section of the
        check referenced "mortgage 5/2016."

  c)    Check 4793 written by Siegmeister to E.A. & B.A. in the amount
        of $1,646.73 cleared on June 3, 2016.  The memo section of the
        check referenced "June 2016."

58.    On March 8, 2016, Siegmeister wrote check 1223, payable to Bowen, in the amount of $38,000 from the Siegmeister Law Firm Account-4706.  The memo of the check referenced "Settlement of Estate LW Thomas."

59.    On April 25, 2016, Siegmeister wrote check 1227, payable to Bowen, in the amount of $11,914.95 from the Siegmeister Law Firm Account-4706.  The memo of the check referenced "Computershare sale diff 9334.47 plus dividends 2580.48."

60.    On April 20, 2016, Thomas' remaining Coca-Cola stock was transferred from Thomas' Computershare account # XXXXXXX2387 into the name of Nancy A. Bowen and deposited into Computershare account XXXXXXX3353 held in the name of Nancy A. Bowen & William G Bowen Joint Tenant.  The transfer was made by Siegmeister, acting as Personal Representative for the Thomas Estate.  The 7,372.80 shares of stock were valued at approximately $321,000 ($43.64 per share) at the time of transfer.  The value of the stock holdings as of the close on September 24, 2020 is approximately $359,016. ($48.70 per share).

61.    Records provided by Computershare Shareholders Services showed that Bowen has received over $50,000 in Coca-Cola stock dividends since July of 2016.  The dividend payments were deposited into Sunstate Bank account # XXXX634 held in the name of William G. Bowen and Nancy Andrews Bowen.

62.    All of the proceeds Siegmeister transferred as Personal Representative of the Thomas Estate to Nancy Bowen and himself were not authorized by the Probate Court.  Siegmeister never filed a petition requesting the remaining Thomas

23

Estate assets be transferred to the beneficiary. The Thomas Estate case is currently still open with the Probate Court.

63.    Jeffrey Siegmeister and his mother, Nancy A. Bowen, received over $985,000 in assets that had belonged to Leonard Thomas.

64.    Siegmeister, an attorney and Voluntary Guardian, did not notify the Probate Court that his mother, Nancy A. Bowen, became the sole beneficiary of his Ward's Estate five weeks after he was appointed Voluntary Guardian. Siegmeister concealed the conflict of interest and that he personally benefitted over $500,000 from the Guardianship and the Thomas Estate from the Probate Court.

65.    During the time Siegmeister was diverting assets of his Ward to himself and his mother and making false representations to the Probate Court in the Third Judicial Circuit of Florida, he was the elected State Attorney for the Third Judicial Circuit of Florida. On December 19, 2019, Jeffrey Siegmeister resigned as the State Attorney for the Third Judicial Circuit of Florida.

## CONCLUSION

WHEREFORE, pursuant to Supplemental Rule G, Plaintiff, United States of America, requests that this Court initiate a process of forfeiture against the Defendant Property, and duly notice all interested parties to appear and show cause why the forfeiture should not be decreed.

The United States further requests that the Court order the Defendant

Property forfeited to the United States for disposition according to law, and that the

United States have such other relief as this case may require.

Dated: October 27, 2020.                    Respectfully submitted,

                                            MARIA CHAPA LOPEZ
                                            United States Attorney

                              By:    *s/ Bonnie A. Glober*
                                     BONNIE A. GLOBER
                                     Assistant United States Attorney
                                     Florida Bar No 0748307
                                     300 N. Hogan Street, Suite 700
                                     Jacksonville, Florida 32202
                                     Telephone: (904) 301-6300
                                     Email:bonnie.glober@usdoj.gov

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Robert W. Blythe, declare under

the penalty of perjury, that I am a Special Agent with the Federal Bureau of

Investigation.  I have read the foregoing Amended Verified Complaint for

Forfeiture in Rem and know the contents thereof, and that the matters

contained in the Amended Verified Complaint are true to my knowledge and

belief.

I have acquired my knowledge in this matter through my personal

experience, observation, and investigation, and through information conveyed

to me by other law enforcement officers, as well as information contained in

the official files and records of the United States.

Executed this 27th day of _October_ 2020.


ROBERT W. BLYTHE
Special Agent
Federal Bureau of Investigation